UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


LEAH HEGEMAN                                          CIVIL ACTION

v.                                                   NO. 18-613

MICHAEL HARRISON, LARRY ADAMS,
and THE CITY OF NEW ORLEANS                          SECTION "F"


<u>ORDER AND REASONS</u>

Before the Court is the defendants' Rule 12(c) motion to dismiss, or in the alternative, Rule 56 motion for summary judgment. For the reasons that follow, the motion is GRANTED, in part, as to the plaintiff's § 1983 claims against Officer Adams and Superintendent Harrison in their official capacities, and DENIED, in part, as to the plaintiff's claims against Officer Adams and Superintendent Harrison in their individual capacities, as well as to her <u>Monell</u> liability claim against the City for failure to discipline.

**Background**

This civil rights lawsuit arises from a young woman's claims that she sustained serious injuries at the hands of the New Orleans Police Department while protesting President Trump's inauguration.

On the evening of January 20, 2017, NOPD officers were ordered to Lafayette Square in New Orleans, Louisiana to monitor the gathering of a protest. Upon arriving to the scene, the officers

observed protestors dressed in black attire with masks or bandanas covering their faces. As the protestors began traveling towards Canal Street, what began as a rally turned into a riot. Members of the public were observed shattering windowpanes, spray painting local businesses and NOPD vehicles, and throwing homemade firecrackers at officers. Officer Larry Adams also witnessed rioters attempt to knock another officer off of his scooter. The officers kept a close eye on the disorderly protestors and arrested those who disturbed the peace of the demonstration.

Leah Hegeman, a 26-year-old resident of New Orleans, was one of the many participants in the protest. Although it is undisputed that Officer Larry Adams encountered Ms. Hegeman in the 500 block of North Rampart Street, the two present strikingly different accounts of their exchange. According to an "Officer Force Statement" completed by Adams, he instructed protestors that the area in which he was apprehending suspects was being cordoned off. When Hegeman attempted to push past him, Officer Adams informed her that she was under arrest for violating a police corridor. Officer Adams further reported that, as he clasped Hegeman's wrists, she pulled away in an attempt to evade custody. Refusing to let Ms. Hegeman go, Officer Adams spun around until the pair "gradually went to the ground."

Ms. Hegeman presents her account of the incident in the form of an affidavit. Hegeman attests that, while standing in the 500

block of North Rampart Street, she observed an NOPD officer beating and choking an unarmed man on the ground. She further attests that, up until that point, she had not been told by law enforcement to disperse from her location, that she was impeding police work, or that she could not film or record the scene. As Ms. Hegeman began to film the altercation, Officer Adams charged toward her violently and pushed her back. However, he did not verbally order or command her to move back, nor did he command her to stop filming. Accordingly, Ms. Hegeman backed away but continued to film the altercation. As she was backing away, Officer Adams "suddenly and violently rushed [her], grabbed [her], and tackled [her] to the ground." Hegeman further attests that she felt a tremendous amount of pressure on her back and the back of her neck and informed Officer Adams that she could not breathe before she briefly lost consciousness. Upon regaining consciousness, Hegeman was handcuffed, and her backpack was removed from her body with a knife.

Suffering from a history of brain cancer, Ms. Hegeman becomes symptomatic and is required to seek medical attention whenever she experiences head trauma. Accordingly, while sitting in the rear of a police car, she informed officers of her condition and requested medical attention. Her requests were met with laughter and delay, and she later vomited due to a concussion.

Ms. Hegeman was eventually transported to University Medical Center for treatment, after which she was taken to Orleans Parish Prison and booked with the following state law crimes: wearing masks in public (La. R.S. § 14:313), inciting a riot (La. R.S. § 14:329.2), and criminal damage to historic buildings or landmarks (La. R.S. § 14:56.5(C)(1)). All charges were subsequently dismissed by the Orleans Parish District Attorney's office.

After investigating the incident, Sergeant Christina Watson of the Public Integrity Bureau's Force Investigation Team determined that the "use of force was justified and within department policy."[1] Sergeant Watson explained in her report:

> Hegeman accused Officer Adams [of] throwing her to the ground and standing on the back of her neck. There is no conclusive video evidence to refute Hegeman's claims, because Officer Adams lost his BWC [body worn camera] before he engaged Hegeman. Therefore, it is possible that Officer Adams may have fallen on her neck because she complained of neck pain . . . . The momentum of Hegeman and Officer Adams falling on the ground could have force[d] Hegeman to hit her head on the ground and irritate[d] her previous condition.

On January 19, 2018, Leah Hegeman filed this 42 U.S.C. § 1983 civil rights lawsuit against the City of New Orleans; former Superintendent of the New Orleans Police Department, Michael Harrison; and NOPD officers, Larry Adams and Christopher Barbe. Hegeman seeks to recover from the defendants for various

---

[1] In an affidavit dated February 5, 2019, Sergeant Christina Watson attests that she "conducted a thorough administrative investigation relative to the incident."

constitutional violations underlying her § 1983 claims, including violations of her First, Fourth, and Fourteenth Amendment rights; she also asserts <u>Monell</u> liability, as well as various state law claims including false arrest, false imprisonment, assault, battery, and intentional infliction of emotional distress.[2] The defendants now move to dismiss the plaintiff's claims under Rule 12(c), or in the alternative, for summary judgment under Rule 56.[3]

I.

<em>A.</em>

The standard for deciding a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure is the same as the one for deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6). <u>Gentilello v. Rege</u>, 627 F.3d 540, 543-44 (5th Cir. 2010). A court may grant a Rule 12(c) motion only if the pleadings evince no disputes of genuine material fact and questions of law alone remain. <u>Great Plains Trust Co. v.</u>

---

[2] Her complaint alleges the following damages: (1) pain and suffering stemming from a concussion, lacerations, bruises, and back and neck injuries she sustained; (2) psychological injuries, including emotional distress, mental anguish, embarrassment, humiliation, and post-traumatic stress disorder; (3) inconvenience and loss of income; (4) medical expenses; (5) property damage in the form of a destroyed backpack and iPhone; and (6) legal fees.
[3] Officer Christopher Barbe was dismissed from this lawsuit, with prejudice, on March 12, 2019. Accordingly, the defendants' pending motion is moot insofar as it requests the dismissal of claims asserted against Barbe.

_Morgan Stanley Dean Witter & Co._, 313 F.3d 305, 312 (5th Cir. 2002) (citations omitted).

In considering a Rule 12(b)(6), or a Rule 12(c) motion, the Court accepts all well-pleaded facts as true and draws all factual inferences in favor of the non-movant. See _id._ at 313 n.8; _Alexander v. City of Round Rock_, 854 F.3d 298, 303 (5th Cir. 2017) (citing _Thompson_, 764 F.3d at 502; _Stokes v. Gann_, 498 F.3d 483, 484 (5th Cir. 2007)); _Doe v. Myspace, Inc._, 528 F.3d 413, 418 (5th Cir. 2008). But, in deciding whether dismissal is warranted, the Court will not accept conclusory allegations in the complaint as true. _Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc._, 677 F.2d 1045, 1050 (5th Cir. 1982). Indeed, the Court must first identify pleadings that are conclusory and, thus, not entitled to the assumption of truth. _Ashcroft v. Iqbal_, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009). A corollary: legal conclusions "must be supported by factual allegations." _Id._ at 1950. Assuming the veracity of the well-pleaded factual allegations, the Court must then determine "whether they plausibly give rise to an entitlement to relief. _Id._

To survive a Rule 12 motion to dismiss or for judgment on the pleadings, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" _Gonzalez v. Kay_, 577 F.3d 600, 603 (5th Cir. 2009) (quoting _Iqbal_, 129 S. Ct. at 1949 (2009)) (internal quotation

marks omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotation marks, citations, and footnote omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.").  This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  Id. (citing Twombly, 550 U.S. at 557) (internal quotations omitted).

In deciding a motion to dismiss, the Court may consider documents that are essentially "part of the pleadings" -- that is, any documents attached to or incorporated in the plaintiff's complaint that are central to the plaintiff's claim for relief. Causey v. Sewell Cadillac-Chevrolet, Inc., 394 F.3d 285, 288 (5th Cir. 2004) (citing Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498-99 (5th Cir. 2000)).  Also, the Court is permitted to

consider matters of public records and other matters subject to judicial notice without converting the motion into one for summary judgment.  See United States ex rel. Willard v. Humana Health Plan of Texas Inc., 336 F.3d 375, 379 (5th Cir. 2003).

*B.*

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion.  See id.  In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party.  See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992).  Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims.  Id.  Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent

opposing evidence.  <u>Martin v. John W. Stone Oil Distrib., Inc.</u>, 819 F.2d 547, 549 (5th Cir. 1987); Fed. R. Civ. P. 56(c)(2). "[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." <u>Hathaway v. Bazany</u>, 507 F.3d 312, 319 (5th Cir. 2007) (internal quotation marks and citation omitted). Ultimately, "[i]f the evidence is merely colorable . . . or is not significantly probative," summary judgment is appropriate. <u>Anderson</u>, 477 U.S. at 249 (citations omitted); <u>King v. Dogan</u>, 31 F.3d 344, 346 (5th Cir. 1994) ("Unauthenticated documents are improper as summary judgment evidence.").

Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. <u>See Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007). Although the Court must "resolve factual controversies in favor of the nonmoving party," it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." <u>Antoine v. First Student, Inc.</u>, 713 F.3d 824, 830 (5th Cir. 2013) (internal quotation marks and citation omitted).

II.

Title 42, United States Code, Section 1983 creates a damages remedy for the violation of federal constitutional or statutory rights under color of state law; it provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

Because § 1983 merely provides a remedy for designated rights, rather than creating any substantive rights, "an underlying constitutional or statutory violation is a predicate to liability." Harrington v. Harris, 118 F.3d 359, 365 (5th Cir. 1997) (citation omitted). To establish § 1983 liability, the plaintiff must satisfy three elements:

(1) deprivation of a right secured by the U.S. Constitution or federal law,
(2) that occurred under color of state law, and
(3) was caused by a state actor.

Victoria W. v. Larpenter, 369 F.3d 475, 482 (5th Cir. 2004) (citation omitted). Ms. Hegeman's § 1983 claims are based upon alleged deprivations of her constitutional rights to be free from excessive force and false arrest under the Fourth Amendment, to freedom of expression under the First Amendment, and to substantive due process under the Fourteenth Amendment.

*A. Claims Against Officer Larry Adams*

In pursuing her § 1983 claims, Hegeman has sued Officer Larry Adams in his official and individual capacities, alleging that he violated her Fourth Amendment rights to be free from excessive force and false arrest, as well as her rights to freedom of expression and peaceable assembly secured by the First Amendment. Because Hegeman also has asserted § 1983 claims against the City itself, her § 1983 claims against Adams in his official capacity are duplicative and must be dismissed. See Romero v. Becken, 256 F.3d 349, 355 (5th Cir. 2001) ("The district court was [] correct in dismissing the allegations against all of the municipal officers . . . in their official capacities, as these allegations duplicate claims against the respective governmental entities themselves.").

Defendant Adams maintains that he is entitled to dismissal of the plaintiff's individual capacity claims because qualified immunity shields him from liability. To support his defense of qualified immunity, Adams contends that he did not violate Hegeman's rights to be free from false arrest or excessive force in light of Fourth Amendment principles because the arrest was supported by probable cause, he used a reasonable amount of force, and his conduct was objectively reasonable in light of clearly-established law.

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not

violate clearly established regulatory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "Qualified immunity is designed to shield from civil liability all but the plainly incompetent or those who violate the law." Brady v. Fort Bend Cty., 58 F.3d 173, 174 (5th Cir. 1995). Generally, "qualified immunity represents the norm." Id.

In resolving government officials' qualified immunity claims, the Court must evaluate two factors: (1) whether the plaintiff has shown the violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendants' alleged misconduct. Pearson, 555 U.S. at 232-36 (holding that a court may consider these prongs in any sequence and need not consider both). Once a defendant invokes the defense of qualified immunity, the burden shifts to the plaintiff to show that the defense is unavailable. See Collier v. Montgomery, 569 F.3d 214, 217-18 (5th Cir. 2009) ("Although nominally an affirmative defense, the plaintiff has the burden to negate the assertion of qualified immunity once properly raised"); see also McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002) (en banc). A plaintiff must establish that the defendant was either personally involved in the deprivation or that his wrongful

actions were causally connected to the deprivation. <u>James v. Tex.</u>
<u>Collin Cty.</u>, 535 F.3d 365, 373 (5th Cir. 2008).

Mindful of the contours of qualified immunity, the Court turns
to the relevant constitutional rights Hegeman asserts Officer
Adams violated – namely, the Fourth Amendment's prohibitions
against false arrest and excessive force, as well as the First
Amendment right to freedom of expression.

*(i)    False Arrest and Violation of Right to Freedom of
        Expression*

Hegeman challenges the constitutionality of her arrest under
both the First and Fourth Amendments.  "A warrantless arrest
without probable cause," or a false arrest, "violates clearly
established law defining an individual's rights under the Fourth
Amendment." <u>Davidson v. City of Stafford</u>, 848 F.3d 384, 391 (5th
Cir. 2017) (citing <u>Hogan v. Cunningham</u>, 722 F.3d 725, 731 (5th
Cir. 2013)).  "Individuals who protest are also protected under
the First Amendment from retaliatory actions by government
officials." <u>Id.</u> (citing <u>Allen v. Cisneros</u>, 815 F.3d 239, 244 (5th
Cir. 2016)).  However, the law is clear that where an officer has
probable cause to arrest an individual, "the objectives of law
enforcement take primacy over the citizen's right to avoid
retaliation." <u>Id.</u> (quoting <u>Allen</u>, 815 F.3d at 245).  Probable
cause exists where "facts and circumstances within the officer's
knowledge [] are sufficient to warrant a prudent person, or one of

reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Id. (quoting Hogan, 722 F.3d at 731).

Therefore, the only question this Court must address in determining whether Adams is entitled to qualified immunity concerning Hegeman's false arrest and freedom of expression claims is whether Hegeman has shown that Adams arrested her without probable cause, and that Adams was objectively unreasonable in believing there was probable cause for her arrest. Id.

Officer Adams contends that his decision to arrest Ms. Hegeman was clearly based on probable cause because she had refused to obey his orders to back away from a police corridor. For support, Adams points to the "Officer Force Statement" he completed following the incident, in which he reported that he advised Hegeman that she was under arrest after she attempted to push past him in violation of a police corridor.

Ms. Hegeman successfully overcomes Officer Adams's qualified immunity defense by pointing to her own affidavit and his deposition testimony. Hegeman alleges in her complaint and attests in her affidavit that, as she began to film an altercation between an NOPD officer and an unarmed man on the ground, Officer Adams charged toward her and violently pushed her back. She further alleges and attests that she "began to back up" while continuing to film the altercation, and that Adams "suddenly and violently"

14

tackled her to the ground as she was backing away.  Interestingly,
Officer Adams corroborated Hegeman's recollection of the facts
during his deposition when he testified that Hegeman was not told
to back away from the police corridor and that she did not attempt
to push past him.[4]  Although Officer Adams also testified that he
proceeded to arrest Hegeman because he had "observed her commit a
crime," he could not recall what crime that may have been.[5]

---

[4] During his deposition on January 4, 2019, Officer Adams testified
as follows:

> **Q:** Yeah, you placed her under arrest, did she make any
> effort to run passed [sic] you?
> **A:** I don't recall, no.
> . . .
> **Q:** All right.  And clearly, Ms. Hegeman did not try –
> did not assault you; is that correct?
> **A:** Not to my knowledge; no.
> **Q:** Not to your knowledge, not that you recall?
> **A:** Not that I recall.
> **Q:** And she didn't try to run at you, right?
> **A:** No.
> . . .
> **Q:** . . . Was Ms. Hegeman told to back away from the
> police corridor?
> **A:** Their client?
> **Q:** Yes, correct, Ms. Hegeman.
> **A:** No.

[5] When asked why he stopped Ms. Hegeman to arrest her, Adams offered
the following testimony:

> **Q:** -- the arrestee, Ms. Hegeman in that video, she was
> not moving towards you, is that correct?
> **A:** No.  She was evading from me because I observed her
> commit a crime.
> **Q:** What crime did you observe?
> **A:** I don't recall offhand . . . But, obviously, I
> wouldn't have been going after her unless I observed her
> commit a crime.
> **Q:** Okay.  When she asked what she's been arrested for,
> what did you tell her?

On this record, genuine factual disputes exist as to whether Officer Adams had observed Ms. Hegeman disobey any police order or commit any crime when he proceeded to arrest her. Because a reasonable jury could find that Officer Adams lacked probable cause, by his own deposition testimony, to arrest Ms. Hegeman and was objectively unreasonable in believing there was probable cause for the arrest, summary judgment in his favor as to Ms. Hegeman's false arrest claim is not warranted.

Hegeman bases her First Amendment claim on a theory of retaliation. To prevail on a First Amendment retaliation claim, Hegeman must establish that: "(1) [she was] engaged in constitutionally protected activity, (2) the defendants' actions caused [her] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against [her] exercise of constitutionally protected conduct." Westfall v. Luna, 903 F.3d 534, 550 (5th Cir. 2018) (per curiam) (quoting Keenan v. Tejeda, 290 F.3d 252, 258 (5th Cir. 2002)).

---

**A:** I don't recall.
                         . . .
**Q:** All right. And what did you specifically see her do again?
**A:** I don't recall.
**Q:** You don't recall what you specifically saw her do?
**A:** No.

Generally, "the validity of a plaintiff's First Amendment claim hinges on probable cause for her arrest." Id.

Here, Ms. Hegeman alleges in her complaint and attests in her affidavit that she was peacefully protesting the inauguration of President Trump and filming an altercation between an NOPD officer and an unarmed man when Officer Larry Adams charged at her, pushed her, and tackled her to the ground. Thereafter, she was handcuffed and arrested. Moreover, the Court has determined that a material disputed fact issue exists as to whether Hegeman's arrest was supported by probable cause. Accordingly, dismissal of Hegeman's freedom of expression claim is inappropriate. See Davidson, 848 F.3d at 391 ("Individuals who protest are also protected under the First Amendment from retaliatory actions by government officials," unless "an officer has probable cause to seize that individual.").

*(ii)* *Use of Excessive Force*

Hegeman next claims that Officer Adams violated her Fourth Amendment right to be free from excessive force; Adams, once again, seeks the shield of qualified immunity.

Under the first step of the qualified immunity analysis, to establish that Officer Adams violated the Fourth Amendment prohibition against excessive force, Ms. Hegeman must show: "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need, and (3) that the use of force was objectively unreasonable." Bush v. Strain, 513 F.3d 492, 500-01

(5th Cir. 2008). "Further, the 'injury must be more than a de minimis injury and must be evaluated in the context in which the force was deployed.'" Lockett v. New Orleans City, 607 F.3d 992, 999 (5th Cir. 2010) (quoting Glenn v. City of Tyler, 242 F.3d 307, 314 (5th Cir. 2001)). In this regard, the Fifth Circuit has clarified, "handcuffing too tightly, without more, does not amount to excessive force." Id.; Freeman v. Gore, 483 F.3d 404, 417 (5th Cir. 2007); Glenn, 242 F.3d at 314.

When apprehending or seizing an individual for law enforcement purposes, police officers must be permitted to use objectively reasonable force in light of the facts and circumstances confronting them; this inquiry is made "without regard to [the officers'] underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 396 (citations omitted). For purposes of summary judgment, the Fifth Circuit has instructed, "where the officer's conduct is less clear and an assessment of reasonableness mandates a number of factual inferences, the case falls within the province of the jury." Lytle v. Bexar Cty., Tex., 560 F.3d 404, 411 (5th Cir. 2009). In other words, summary judgment should be granted

*only* if "no rational jury could conclude that [the officer] violated the Fourth Amendment." Id. at 412.

Here, Hegeman has satisfied the first prong of the qualified immunity analysis as to Officer Adams. According to Hegeman's account of the incident, as alleged in her complaint and presented in the form of an affidavit, she sustained both physical and mental injuries as a result of the force used by Officer Adams. She attests that Officer Adams tackled her to the ground and that she felt a tremendous amount of pressure on the back of her neck and her back. After telling Officer Adams that she could not breathe, she briefly lost consciousness. Hegeman further declares, under oath, that she sustained a concussion, which caused her to vomit, and that her requests for medical attention were met with laughter and delay. As for her psychological injuries, Hegeman points to a letter from a licensed clinical social worker, which indicates that the incident exacerbated Hegeman's pre-existing post-traumatic stress disorder and rendered her unable to sustain gainful employment. Such evidence, at a minimum, creates an issue of fact as to whether Hegeman suffered injuries that were "more than . . . de minimis." See Lockett, 607 F.3d at 999; Glenn, 242 F.3d at 314.

As for the objective reasonableness of Officer Adams's use of force, the Court must consider the following factors: (1) "the severity of the crime at issue," (2) "whether the suspect poses an

19

immediate threat to the safety of the officers or others," and (3) "whether [s]he is actively resisting arrest or attempting to evade arrest by flight." Bush, 513 F.3d at 501 (quoting Graham, 490 U.S. at 396). It is undisputed that Hegeman was charged with wearing a mask in public, inciting a riot, and criminal damage to a historic building or landmark and that all charges were later dismissed. Hegeman also attests that, "[a]t no time on January 20, 2017 did [she] engage in any unlawful or disorderly behavior," and that she was not told she had violated any law, or ordered to back away or stop filming before Adams attempted to arrest her. Nonetheless, she attests that she did back away, and that Officer Adams tackled her as she proceeded to do so.

During his deposition, Officer Adams initially testified that he decided to arrest Hegeman because she refused to back up when he advised that she was too close to a police corridor, and that he saw her commit no other crime. He later testified that he proceeded to arrest Hegeman because he had witnessed her commit some other criminal act, although he could not recall which crime that may have been. Adams went on to state, under oath, that Hegeman never attempted to push past him and that they both fell to the ground because he refused to let go when attempting to effectuate the arrest.

While Adams *argues* in his papers that he never tackled Hegeman or placed pressure on her body once she was on the ground, the

video footage is at best inconclusive on these central points. Although the footage captured on other officers' body cameras does not depict Officer Adams tackle the plaintiff to the ground or place pressure on her neck and back, the footage *also* does not show how Ms. Hegeman arrived on the ground or depict her body for the entire duration in which it remained on the ground. Moreover, the footage does not show Ms. Hegeman disobey Officer Adams's orders. Finally, while Officer Adams claims that Hegeman was resisting arrest, the footage does not indicate that he told Hegeman she was under arrest before he grabbed her. Accordingly, the footage does not conclusively disprove the plaintiff's account of the incident.[6]  Cf. Scott v. Harris, 550 U.S. 372, 380-81 (2007) (holding that the plaintiff's "version of events [wa]s so utterly discredited by [a videotape] in the record that no reasonable jury could have believed him").

---

[6] The record contains body worn camera footage captured by NOPD officers Matthew Malveaux, Joseph Davis, and Russell Green, who were present during Hegeman's encounter with Officer Adams.  With respect to Officer Malveaux's footage, the viewer first sees Officer Adams and Hegeman standing and facing each other on a sidewalk.  Hegeman says, "I did nothing wrong, sir."  And Adams responds, "Yeah you did . . . ."  As these words are exchanged, Adams grabs Hegeman's arms in an attempt to handcuff her, after which Officer Malveaux turns away, such that Adams and Hegeman are no longer visible.
    As for Officer Davis's footage, the viewer can see Officer Adams kneeling next to Hegeman, who is lying face down on the ground.  Neither a person, nor object, is touching Hegeman's neck.
    Finally, with respect to Officer Green's footage, Hegeman is not visible; the viewer sees nothing more than several officers gathered on a sidewalk.

Hegeman's affidavit, coupled with inconclusive video footage and Adams's contradictory deposition testimony, raise unresolved questions about what, in fact, occurred. On this record, serious and pivotal issues of fact exist as to whether Officer Adams aggressively charged at Hegeman without having probable cause to believe she had committed a crime, tackled her to the ground without warning her that she was under arrest, and placed pressure on the back of her neck after she was already subdued. Because genuine issues of material fact exist as to whether a reasonable officer on the scene would have found Officer Adams's use of force excessive to the need and therefore objectively unreasonable, summary judgment as to the reasonableness of Adams's use of force is wholly inappropriate.

Next, the Court must determine whether Adams's "use of force, though a violation of the Fourth Amendment, was nevertheless objectively unreasonable in light of clearly established law." Bush, 513 F.3d at 501. "[W]hile the right to be free from excessive force is clearly established in a general sense, the right to be free from the degree of force employed in a particular situation may not have been clear to a reasonable of officer at the scene." Id. at 502. In this vein, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396.

Because the law at the time of Hegeman's arrest "clearly established that it was objectively unreasonable for several officers to tackle an individual who was not fleeing, not violent, not aggressive, and only resisted by pulling his arm away from an officer's grasp," Traummell v. Fruge, 868 F.3d 332, 343 (5th Cir. 2017), the Court finds that Traummell gave Officer Adams "fair warning" that it was unconstitutional for a three-hundred-pound officer, like him, to tackle an individual to the ground simply because she attempted to avoid his grasp. The law also "clearly established" that a person has a right to not be crushed by the weight of a police officer once subdued. See Bush, 513 F.3d at 501 (holding that officers forcefully slamming a suspect's face into a vehicle when the suspect was already subdued, causing injuries to her face, teeth, and jaw and requiring significant medical treatment and expense was excessive to the need and objectively unreasonable). Accordingly, summary judgment as to Adams's qualified immunity defense is not warranted.[7]

---

[7] Ms. Hegeman also asserts claims under Louisiana law for false arrest, false imprisonment, assault, battery, intentional infliction of emotional distress, and for violation of the rights "to privacy, to liberty, to be left alone, to locomotion, to travel, to be free from unreasonable search and seizure, to be free from unjustifiable and excessive use of force," as well as the rights to free speech, association, and assembly, and the rights to due process of law and equal protection under state law.
    The defendants appear to contend that, because there is no actionable § 1983 claim against them, the Court should decline to exercise supplemental jurisdiction over the plaintiff's state law claims. Because the Court has determined that the plaintiff has

*B. Claims Against the City of New Orleans and Former Superintendent Michael Harrison in His Official Capacity*

The City and Michael Harrison seek a judgment dismissing the plaintiff's § 1983 claims against them. The defendants submit that the plaintiff has failed to allege and prove that a policy, practice, or custom of Superintendent Harrison and the City was the moving force behind any alleged constitutional violation.[8]

Municipalities are "persons" within the meaning of § 1983 and may be liable under this law if the governmental body itself subjects a person to, or causes a person to be subjected to, a deprivation of rights. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978). But, it has been cautioned, "[t]hey are liable only for their own acts and not those attributed to them by principles of *respondeat superior*." Victoria W. v. Larpenter, 369 F.3d 475, 482 (5th Cir. 2004) (citing Monell, 436 U.S. at 691-92). "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the

---

pled, and raised genuine issues of material fact with respect to, her federal constitutional claims, the defendants' efforts to dismiss her state law claims are without merit.

[8] Because the plaintiff's § 1983 claims against Harrison in his official capacity are redundant to the Monell liability claims asserted against the City, dismissal of her official capacity claims against Harrison is appropriate. See Romero, 256 F.3d at 355.

injury that the government as an entity is responsible under § 1983." <u>Monell</u>, 436 U.S. at 694.

To determine whether municipal liability attaches, the Court considers whether unconstitutional conduct is directly attributable to the municipality through some official custom or policy; "isolated unconstitutional actions by municipal employees will almost never trigger liability." <u>See</u> <u>Piotrowski v. City of Houston</u>, 237 F.3d 567, 578 (5th Cir. 2001) (citations omitted). Indeed, the rules for imposing municipal liability are well-settled; proof of three elements is central: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." <u>Valle v. City of Houston</u>, 613 F.3d 536, 541-42 (5th Cir. 2010) (quoting <u>Pineda v. City of Houston</u>, 291 F.3d 325, 328 (5th Cir. 2002) (citation omitted)).[4] Official (<u>Monell</u>) municipal policy "includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." <u>See</u> <u>Connick v. Thompson</u>,

---

[4] Proof of these three elements is necessary "to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." <u>Burge v. Parish of St. Tammany</u>, 187 F.3d 452, 471 (5th Cir. 1999) (citation omitted).

563 U.S. 51, 61 (2011) (citations omitted) ("These are 'action[s] for which the municipality is actually responsible.'").

Pointing to no written municipal policy, Hegeman urges the Court to hold the City of New Orleans liable under § 1983 on the basis of several unofficial policies. "In order to find a municipality liable for a policy based on a pattern," the Fifth Circuit has instructed, "'that pattern must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.'" Davis v. City of Stafford, 848 F.3d 384, 396 (5th Cir. 2017) (quoting Peterson v. City of Fort Worth, 588 F.3d 838, 850 (5th Cir. 2009)). Stated differently, such a "pattern requires similarity, specificity, and sufficiently numerous prior incidents." Id.

The plaintiff advances three theories of liability in her complaint: (1) an unwritten municipal policy of disrupting constitutional gatherings to chill the exercise of civil rights; (2) a failure to adequately train and supervise officers in the use of force; and (3) a failure to discipline, which amounts to a municipal custom of condoning the use of excessive force.[9] The

---

[9] Specifically, the plaintiff's complaint provides that the City of New Orleans and/or Michael Harrison, in their official capacities: (1) "have authorized . . . and condoned a policy, practice and custom whereby constitutionally protected gatherings

Court considers each claim in turn, emphasizing that "one act is not itself a custom" and that "[t]here must be a 'persistent and widespread practice.'" Pineda v. City of Houston, 291 F.3d 325, 329 (5th Cir. 2002) (quoting Piotrowski, 237 F.3d at 581).

First, the plaintiff fails to establish that the NOPD's alleged interference with constitutional gatherings in an effort to chill the exercise of civil rights amounts to a "persistent and widespread practice." Hegeman neither alleges facts nor presents evidence to establish official disruption of any constitutional gathering aside from the protest in which she participated. Because it is well-settled that "one act is not itself a custom," the plaintiff's "disruption" theory of § 1983 liability must fail. See Pineda, 291 F.3d at 329.[10]

---

and activities have been the subject of disruption, interference, harassment and intimidation, in an effort to deter, frustrate, intimidate and have a chilling effect upon the civil rights of New Orleans citizens and/or residents;" (2) "have exhibited a policy, practice, and/or custom of callousness and reckless disregard for the civil rights of residents like the Plaintiff in their failure to adequately screen, hire, train, supervise, and/or discipline employees and police officers;" and (3) "have exhibited a policy, practice and/or custom of concealing civil rights violations."

[10] Insofar as Hegeman attempts to establish the existence of a policy or custom by alleging that Superintendent Harrison subsequently "ratified" his subordinates' conduct, such efforts likewise are without merit. Fifth Circuit precedent is clear that ratification liability exists only in the case of an "extreme factual situation," such as where a supervisor condones the act of "'pour[ing]' gunfire onto a truck," which kills an innocent occupant. See Peterson v. City of Fort Worth, 588 F.3d 838, 848 (5th Cir. 2009) (citing Grandstaff v. City of Borger, 767 F.2d 161 (5th Cir. 1985)).

The Court next considers the plaintiff's attempt to establish *Monell* liability by alleging that the City and Superintendent Harrison failed to properly train their officers. To recover under a failure-to-train theory of liability, Hegeman must prove that: "1) the [City] failed to train or supervise the officers involved; 2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and 3) the failure to supervise or train constituted deliberate indifference to the plaintiff's constitutional rights." Peña v. City of Rio Grande City, 879 F.3d 613, 623 (5th Cir. 2018) (quoting Thompson v. Upshur Cty., 245 F.3d 447, 459 (5th Cir. 2001)). "[F]or liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective." Roberts v. City of Shreveport, 397 F.3d 287, 293 (5th Cir. 2005) (citing Benavides v. Cty. Of Wilson, 955 F.2d 968, 973 (5th Cir. 1992)). Moreover, the Supreme Court has instructed, deliberate indifference is a "stringent standard of fault" and ordinarily requires a "pattern of similar constitutional violations by untrained employees." Connick, 563 U.S. at 62.

Hegeman's complaint glaringly fails to identify any inadequacy in the City's training program itself. Rather, she alleges that Superintendent Harrison – and thus the City – "failed to properly supervise and train the *officers in this incident* to

avoid unreasonable seizures, unlawful arrests, unlawful harassment, and excessive force;" she further claims that Harrison failed to "adequately train them to approach, interview and investigate citizens in a constitutional manner." (emphasis added). These generalized boilerplate allegations, without more, do not permit this Court to infer that the City maintained a widespread practice of failing to properly train its police force on the making of investigatory stops. Because Hegeman alleges neither a pattern of similar constitutional violations by untrained employees, nor a complete failure to train her arresting officers, her failure-to-train claim fails on the deliberate indifference prong. See Peña, 879 F.3d at 624 ("[T]here is a difference between a *complete failure to train*[] . . . and a failure to train in one limited area.") (quoting Estate of Davis ex rel. McCully v. City of N. Richard Hills, 406 F.3d 375, 386 (5th Cir. 2005)); see also Connick, 563 U.S. at 61 ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.").

Finally, the Court considers Hegeman's allegation that the City and Superintendent Harrison failed to adequately discipline the use of force by NOPD officers. Stated differently, this claim amounts to an allegation that the City maintained an unwritten "policy that was permissive of excessive force;" it requires the plaintiff to show a pattern of similar uses of excessive force

that went ignored.  See Peterson v. City of Fort Worth, 588 F.3d 838, 850 (5th Cir. 2009).  The Fifth Circuit has recognized that "a City policy of inadequate officer discipline could be unconstitutional if it was pursued with deliberate indifference toward the constitutional rights of citizens." Piotrowski v. City of Houston, 237 F.3d 567, 581 (5th Cir. 2001).  A plaintiff may prove the existence of such a policy by pointing to "a purely formalistic investigation in which little evidence was taken, the file was bare, and the conclusions of the investigator were perfunctory."  Id. at 582.  However, "it is nearly impossible to impute lax disciplinary policy to the City without showing a pattern of abuses that transcends the error made in a single case." Id. (citations omitted).  Indeed, such a "pattern could evidence not only the existence of a policy but also official deliberate indifference."  Id.

With respect to her failure-to-discipline theory of liability, Ms. Hegeman alleges in her complaint that "Harrison protected and sheltered officers, including [Officers Adams and Barbe], from accountability and/or discipline for their unlawful arrests and use of force."  She further claims that the former superintendent, "having supervisory authority over internal investigations and discipline, has repeatedly condoned and ratified the illegal and unconstitutional acts of NOPD officers, including but not limited to those described herein."  Finally,

she alleges that "Harrison failed to take appropriate action to re-train or other wise [sic] address the misconduct of the officers in this case."

The City contends that Hegeman has failed to state a claim for failure to discipline because the NOPD's "disciplinary policies were not deficient." For support, the City submits that the Public Integrity Bureau committed a "thorough administrative investigation" following the incident and determined that Officer Adams's "use of force was justified and within department policy." If Hegeman based her failure-to-discipline claim solely upon the City's failure to thoroughly investigate this incident and discipline Adams on this one occasion, the Court might agree that there is no basis to impute a policy of lax discipline to the City.

However, viewing the facts in the light most favorable to the plaintiff, Ms. Hegeman alleges that Superintendent Harrison *repeatedly* failed to discipline Officer Adams and others for their use of force. And, in opposing the City's motion, Hegeman tellingly points to employment records dating back to 2011, which indicate that eleven use-of-force complaints were lodged against Officer Adams within an eight-year period. The plaintiff also spotlights that, between 2013 and 2017, the NOPD received more than 8,400 complaints, over 200 of which concerned the use of unauthorized force.

In reply, the City urges that Hegeman's reliance on prior use-of-force complaints is misplaced because the number of complaints lodged does not account for the percentage of "unfounded" complaints. Indeed, the City notes, the Public Integrity Bureau investigates each use-of-force complaint, and "none of Officer Adams's use of force investigations have resulted in discipline or violation of a departmental policy."

The Fifth Circuit has rejected reasoning nearly identical to that advanced by the City. See Peterson, 588 F.3d at 852 ("[T]hat the department itself vaguely ruled most of its complaints 'not sustained' or 'unfounded' is no assurance that these investigations exonerate the City. To the contrary, that only four of the 27 complaints were 'sustained' after investigation may tilt in Peterson's favor.").

Moreover, another Section of this Court, in Hayward v. City of New Orleans, determined that the City was not entitled to summary judgment on a failure-to-discipline claim where the City neither re-trained, nor disciplined, an officer who been the subject of thirteen abuse-type complaints within a nine-year period. No. 02-3532, 2004 U.S. Dist. LEXIS 2010 (E.D. La. Feb. 12, 2004) (Fallon, J.). The Hayward court reasoned that such evidence raised questions of fact concerning whether the city's policymakers had notice of the complaints against the officer, whether the city was deliberately indifferent to those complaints,

and if so, whether the city's failure to discipline the officer was the moving force behind the plaintiff's injuries.  Id. at *20-21.  As in Hayward, the copious use-of-force complaints against Officer Adams (and his colleagues), on this record, create a fact issue that the City's policymakers had notice of the complaints, that the City's investigation process is "purely formalistic" or "perfunctory," and that the City's failure to discipline Officer Adams was the moving force behind Ms. Hegeman's injuries. Accordingly, summary judgment in favor of the City is inappropriate as to the plaintiff's Monell liability claim for failure to discipline.

   C. Claims Against Superintendent Michael Harrison in His
      Individual Capacity

   Ms. Hegeman also asserts § 1983 claims against Superintendent Harrison in his individual capacity.  Supervisory officials are not in law vicariously liable for a subordinate's actions; rather, § 1983 liability only applies if the officials (1) "affirmatively participate in acts that cause constitutional deprivation," or (2) "implement unconstitutional policies that causally result in plaintiff's injury." Mouille v. City of Live Oak, Tex., 977 F.2d 924, 929 (5th Cir. 1992).  To state a § 1983 claim against Superintendent Harrison in his individual capacity, the plaintiff "must satisfy a heightened pleading standard;" she "must allege

specific facts giving rise to a constitutional violation." <u>Oliver</u>
<u>v. Scott,</u> 276 F.3d 736, 741-42 (5th Cir. 2003).

Here, Hegeman does not allege that Superintendent Harrison
actively engaged in the conduct that violated her constitutional
rights. Rather, she claims that he promulgated an unwritten policy
that was permissive of the use of excessive force; specifically,
she alleges in her complaint that he protected and sheltered
officers from accountability and discipline for their use of force,
condoned their unconstitutional acts, and failed to address such
misconduct. In this regard, Hegeman's § 1983 claim against
Harrison in his individual capacity dovetails with her <u>Monell</u>
liability against the City, and she relies upon the same facts in
support of both claims. Accordingly, for the same reasons that
Hegeman's municipal liability claim for failure to discipline
against the City survives summary dismissal, her individual
capacity claim against Harrison likewise persists.[11]

Accordingly, for the foregoing reasons, IT IS ORDERED: that
the defendants' motion to dismiss or for summary judgment is
GRANTED, in part, as to the plaintiff's § 1983 claims against
Officer Adams and Superintendent Harrison in their official
capacities, and DENIED, in part, as to the plaintiff's claims
against Officer Adams and Superintendent Harrison in their

---

[11] To the extent that Harrison invokes qualified immunity, the
Court defers ruling on this issue because it is not briefed.

individual capacities, as well as to her <u>Monell</u> liability claim
against the City for failure to discipline.

New Orleans, Louisiana, March 20, 2019

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE